## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF FLORIDA

**UNITED STATES OF AMERICA;**
**TERESA GAFFNEY**, as an
individual and
**LESLIE ANN FERDERIGOS**
**ESQ. (RET.),** as an individual
and Retired Florida Licensed
Attorney

Plaintiff(s) and Relator(s),

-vs-

**STATE OF FLORIDA,**
**THE FLORIDA SUPREME COURT,**
governmental branch of Florida
**THE FLORIDA BAR ASSOCIATION,** a
Florida agency,
**THE FLORIDA BAR FOUNDATION, aka**
**FUNDING FLORIDA LEGAL AID (FFLA)**,
Florida Bar's Non-Profit registered as a
501(c)(3)
**FLORIDA LAWYERS ASSISTANCE, INC.**
**(FLA)**, Florida Bar's Non-Profit registered as
a 501(c)(3)
**FLORIDA LAWYERS MUTUAL INSURANCE**
**COMPANY (FLMIC),** insurance company
created by The Florida Bar

Defendant(s).

Case No.
4:24-cv379

**COMPLAINT**
**AND**
**JURY DEMAND**

## FALSE CLAIMS QUI TAM

COMES NOW, Plaintiffs, UNITED STATES OF AMERICA, TERESA GAFFNEY, as an individual and Co-Relator [hereinafter "RELATOR GAFFNEY"], LESLIE ANN FERDERIGOS, as an individual and Co-Relator [hereinafter "RELATOR FERDERIGOS"], acting on behalf of themselves, against DEFENDANT(S), State of Florida, The Florida Bar Association, The Florida Bar Foundation, aka Funding Florida Legal Aid (FFLA), Florida Lawyers Assistance, Inc., Florida Lawyers Mutual Insurance Company, alleged as follows:

## INTRODUCTION

1. Relator(s), LESLIE ANN FERDERIGOS and TERESA GAFFNEY, acting on behalf of the United States, brings forth this Qui tam claim for damages and civil penalties arising from the collaborative conduct of the DEFENDANT(S), in violation of the Civil False Claims Act, 31 U.S.C. § 3729, et seq. ("FCA") and state-law counterparts in Florida. The FCA violations arise out of requests for tax-exempt organizations under 501(c)(3) of the Internal Revenue Service (IRS) when engaging in prohibited activities,

including but not limited to, private benefit, lobbying, political lobbying, unrelated business income (UBI). These payors are collectively referred to herein as the "Government Programs."

2. This action concerns the collaborative deceitful efforts of the DEFENDANT(S) in manipulating a scheme where members of The Florida Bar (TFB) have created non-profits that receives both large donations from Large Law Firms, who are members of The Florida Bar (TFB), force members of TFB to make payments under the guise of evaluations and treatments for solo, small and mid-size law firms. These donations and forced payments are paid back to The Florida Bar in the form of grants where TFB then funds and provides substantial benefits to committees within TFB in the furtherance lobbying efforts.

3. Members of TFB who go against the political agenda of TFB committees who engage in extensive lobbying are being targeted, exploited, criminally threatened and reputations ruined for challenging the harmful actions being taken against wards held in guardianships by attorneys.

4. The Florida Bar with the assistance of Florida Lawyers Assistance (FLA) and The Florida Bar Foundation (FFLA), have taken

measures to withhold documents from the public and falsely portray the scheme created and have exploited members of The Florida Bar by creating false portrayals of them in documentation in furtherance of supporting their lobbying efforts.

5. Some specific lobbying efforts, that have directly affected the Relators in this complaint include members of TFB, who serve on the Elder Law Committee, who lobby and support the lobbying efforts to ensure attorney fees continue to remain of F.S.A. §744.108 Upon information and belief, the named DEFENDANT(S) have intentionally abused their powers in furtherance of a political and financial agenda to ensure there lobbying efforts performed through their committees.

6. When RELATOR FERDERIGOS, made it publicly known the issues many guardianship victims were facing was a direct cause of the statute allowing attorneys fees to be collected from a ward's estate, she received death threats connected to members of TFB, the stealing of her law firms property, hacking into her phone and social media accounts that were discovered to be connected with members of TFB.

**7.** DEFENDANT(S) continue to exploit Elderly and Disabled victims and their families, who are held in guardianships across Florida, leaving them penniless and physically harmed, while they benefit with the help of nursing homes, doctors, and other 3rd parties in the taking of the vulnerable estates and assets.

**8.** DEFENDANT(S) knowingly submit, have caused the submission of, false claims to the government. This includes fraudulent activities like overbilling, false statements, and kickbacks. Members of TFB, have furthered medicare and Medicaid, and SSI to be collected in guardianship cases, while connecting with local hospitals across the state of Florida for unnecessary billing. RELATOR FERDERIGOS, handled several cases and witnessed the actions taken by members of TFB, in furtherance of this scheme.

**9.** RELATOR FERDERIGOS, became a whistleblower to the guardianship crisis in Florida perpetrated by members of TFB and soon after became a target of members of TFB, who served on the Elder Law Committee, were engage in substantial lobbying to their financial benefit.

**10.** The DEFENDANT(S) scheme alleged in this complaint has led to unregulated sabotaging legal careers, mismanagement of Federal

Funds, such as SSI, medicare, Medicaid, of wards held in guardianships, exploitation of members with TFB who challenge the actions taken by members of TFB who are causing this mismanagement. Targeted members are ultimately left with no ability to work as an attorney in Florida and inability to pay back federal student loans because of these efforts, and exclusive power to ensure their political agendas are not met with opposition. DEFENDANT(S) have created a legal monopoly lacking in disclosure and transparency to the public and target members of the bar based on finances and political beliefs.

11.    DEFENDANT FFLA and DEFENDANT FLA both are recipients of tax exemptions under 501(c)(3) of the Internal Revenue Service (IRS), have orchestrated an internal system that funnels money donated by large firms and forced on by solo, small and mid-sized law firms under the guise of evaluations and treatments. This money is funneled back to TFB and then used to fund and give benefits to committees to further lobbying efforts on various political agendas. This has created a roadblock within the legal profession to prevent any outside attorney from ceasing these activities to the detriment of the public.

12.  It is believed the motive behind the DEFENDANT(S) actions is to maintain exclusive control over lawyer regulation to prevent the disruption of these efforts and to accumulate substantial funding through TFB disciplinary system (collecting money through forced evaluations and treatments to evade discipline and payments for insurance to ensure the avoidance of discipline) and tax exemptions from the IRS to allow for substantial funds to maintain their political and lobbying efforts.

**13.**  Pursuant to § 3729(a), this action arises in part from knowingly making use or cause to be used a non-transparent flow of funds that mislead and distort record for both DEFENDANT FFLA and DEFENDANT FLA true use of these funds, while benefitting from tax exemptions received from the IRS and Federal Government.

**14.**  The DEFENDANT(S) collaborative efforts and actions continue to mislead the Federal Government, members of the Florida Bar, and the Public, causing substantial federal funds and tax exemptions to be improperly used against the intent and purpose of a 501(c)(3).

**15.**  The DEFENDANT FFLA has recently taken measures to further conceal their connection with DEFENDANT TFB, by changing their

name in 2024 from *Florida Bar Foundation* to *Funding Florida Legal Aid (FFLA)*, a furtherance to conceal their scheme intended to support their lobbying efforts.

16.   Defendant, FLORIDA LAWYERS ASSISTANCE, INC. (FLA), a non-profit corporation under 501(c)(3) created and funded by TFB, that monitors targeted attorneys face with disciplinary investigations, that are discretionary as to which ethic complaints are pursued. If a member of the bar is believed to have a mental health diagnosis they are forced to participate and provide payments for evaluations and treatment by healthcare professional selected by the TFB. Most targeted attorneys are *solo practitioners & small and mid-size law firms* unable to afford to make large donations to the FFLA. This ensures TFB can collect additional funds beyond mandatory bar membership dues. Funds generated are used to fund and provide benefits to committees engaging in lobbying efforts. The   FLA has also participated in amendments to rules to expand the criteria for classifications of issues that require monitoring by TFB.

17.   Defendant, THE FLORIDA LAWYERS MUTUAL INSURANCE COMPANY (FLMIC) was created by THE FLORIDA BAR to provide lawyers' professional liability insurance to Florida attorneys. The founding directors and shareholders are exclusively members of THE FLORIDA BAR and have acted as Counsel defending TFB in various lawsuits brought against them.  FLMIC is the holding company to *Florida Lawyers Mutual Service Insurance Company* and *Florida Lawyers Insurance Agency, Inc.* One of their policies includes disciplinary proceeding coverage as a standard feature brought against an insured lawyer by TFB. They specifically advertise to *solo practitioners & small and mid-size law firms.* It is a mutual insurance company, meaning it is owned exclusively by its insured lawyers. However, the fees are paid back to TFB in disciplinary cases. TFB takes these funds to pay and provide benefits to their committee in furtherance of their political and lobbying agendas.

**18.**   DEFENDANT FSC, now made up exclusively of Florida Bar Members, intentionally lack oversight over attorney self-regulation, while delegating exclusive control to DEFENDANT TFB, who in turn has funded a variety of profit generation entities set

up in furtherance of power, control, and financial benefit to a
selected life group in Florida, which is the judiciary who are
mandated to maintain membership in a self-regulated legal
profession.

## JURISDICTION AND VENUE

1. This court has jurisdiction of the subject matter of this action
   pursuant to 31 U.S.C. § 3732(a), 28 U.S.C. § 1331 and 28
   U.S.C. § 1367, and has personal jurisdiction over the
   DEFENDANT(S) because the majority of DEFENDANT(S) reside
   and do business in the Northern District of Florida.

2. Venue is proper in this District pursuant to 28 U.S.C. § 1391
   and 31 U.S.C.§ 3732(d), because DEFENDANT(S) transacts
   business in the Northern District.

3. The facts and circumstances alleged in this complaint have not
   been publicly disclosed in a F e d e r a l  criminal, civil, or
   administrative hearing in which the Government or its agent is
   a party, nor in any congressional, Government Accountability
   Office, or other Federal report, hearing, audit, or investigation,

or in the news media.  There has therefore been no statutorily relevant public disclosure of the "allegations or transactions" in this complaint under 31 U.S.C. §3730(e).

4. Relators worked within Florida's legal system and are "original sources" of the information upon which this complaint is based, as that term is used in the False Claims Act and the similar acts in violation of Federal Laws alleged in this Complaint.

<u>PARTIES</u>

1. The real parties in interest to the claims in this action are the United States of America and the State of Florida, specifically the Judicial Branch and branches derived from.

2. Relator, LESLIE ANN FERDERIGOS, (hereinafter, RELATOR FERDERIGOS), is a Retired Florida Licensed Attorney, who held her license to practice law in State Courts in Florida, as well as, the Southern, & Middle District of Florida and maintain her mandatory bar membership with The Florida Bar from 2016 until 2023. She predominantly practiced in the areas of restoration of rights to wards held in guardianships, parental

rights in dependency and family law and is domiciled in Orange County, Florida.

3. Relator, TERESA GAFFNEY, (hereinafter, RELATOR GAFFNEY) held her license to practice law in Florida and maintained her mandatory membership to The Florida Bar for 39 years from 1984 until 2023. In 2023, she was disbarred by TFB on a summary judgment which, the FSC approved. She exclusively practiced in tax law and domiciled in Hillsborough County, Florida.

4. Defendant, the FLORIDA SUPREME COURT (FSC), is those who are the highest state court in Florida, the Judiciary. Article V, Section 15 of the Florida Constitution states that it "shall have exclusive jurisdiction to regulate the admission of persons to the practice of law and the discipline of persons admitted." It disciplines lawyers with its "official arm," the defendant, The Florida Bar (TFB).

5. Defendant, THE FLORIDA BAR ASSOCIATION (TFB), (hereinafter "TFB") is an agency delegated exclusive jurisdiction over attorney regulation, rule-making power, who has created

committees and non-profit and for-profit entities by the Florida Supreme Court who is domiciled in the Northern District of Florida

6. Defendant, THE FLORIDA BAR FOUNDATION, INC., (hereinafter "FFLA") who in 2024 changed their name from *Florida Bar Foundation* to *Funding Florida Legal Aid (FFLA)*. They are a non-profit created by TFB and fund by donations from members of TFB who are registered under Not For Profit Corporation Act (the "Act") and a 501(c)(3) of the Internal Revenue Code, whose principal place of business is 875 Concourse Parkway South, Suite 195, Maitland, FL 32751.

7. Defendant, FLORIDA LAWYERS ASSISTANCE, INC. (FLA), a non-profit corporation under 501(c)(3) created by TFB, that monitors targeted attorneys with mental health diagnosis by forcing participation and payments for evaluations and treatment selected by TFB.

8. Defendant, THE FLORIDA LAWYERS MUTUAL INSURANCE COMPANY (FLMIC) was created by THE FLORIDA BAR to provide lawyers' professional liability insurance to Florida

attorneys. The founding directors and shareholders are exclusively members of THE FLORIDA BAR and have acted as Counsel defending TFB in various lawsuits brought against them. FLMIC is the holding company to *Florida Lawyers Mutual Service Insurance Company* and *Florida Lawyers Insurance Agency, Inc.* One of their policies includes disciplinary proceeding coverage as a standard feature brought against an insured lawyer by TFB. They specifically advertise to *solo practitioners & small and mid-size law firms.* It is a mutual insurance company, meaning it is owned exclusively by its insured lawyers. However, the fees are paid back to TFB in disciplinary cases. TFB takes these funds to pay and provide benefits to their committee in furtherance of their political and lobbying agendas. They are domiciled and maintained business in the Northern District of Florida.

## A. DEFENDANT TFB, DEFENDANT FFLA, AND DEFENDANT FLA ARE ALL REGISTERED AS 501(c)(3)

9. A section 501(c)(3) organization must not be organized or operated for the benefit of private interests, such as the creator

or the creator's family, shareholders of the organization, other designated individuals, or persons controlled directly or indirectly by such private interests. No part of the net earnings of a section 501(c)(3) organization may inure to the benefit of any private shareholder or individual. A private shareholder or individual is a person who has a personal and private interest in the activities of the organization.

## B. DEFENDANT(S) SCHEME FILTERS MONEY THAT CONDUCTS EXTENSIVE LOBBYING

10.    No organization may qualify for section 501(c)(3) status if a substantial part of its activities is attempting to influence legislation (commonly known as lobbying). A 501(c)(3) organization may engage in some lobbying, but too much lobbying activity risks loss of tax-exempt status.

11.    Legislation includes action by Congress, any state legislature, any local council, or similar governing body, with respect to acts, bills, resolutions, or similar items (such as legislative confirmation of appointive office), or by the public in referendum, ballot initiative, constitutional amendment, or

similar procedure.  It does not include actions by executive, judicial, or administrative bodies.

12.     An organization will be regarded as attempting to influence legislation if it contacts, or urges the public to contact, members or employees of a legislative body for the purpose of proposing, supporting, or opposing legislation, or if the organization advocates the adoption or rejection of legislation.

13.     DEFENDANT TFB has a Legislation Committee that considers proposals for legislative or political action by The Florida Bar and voluntary Florida bar groups [Florida Bar Legislative Activity, March 4, 2025] The Bar works with lawmakers to craft legislation that benefits the legal profession and the public, such as increasing the criminal penalties for the unlicensed practice of law [Vol. 78, No. 10 Nov 2004, The Bar's Legislative Lobbying Policy]

> "….and give sections the maximum freedom to pursue their separate lobbying agendas.
>
> "The rules for political advocacy are significantly different for Bar sections. Because they are organizations that lawyers choose to join and are supported with voluntary funds,

sections are allowed a wider lobbying scope. The Board of Governors exercises only general oversight of section legislative activities; indeed, sections are even permitted to oppose one another on specific issues. However, Florida Supreme Court rules require that sections clearly identify themselves in their advocacy, and explain that they do not represent the entire Bar but only their individual section members"

14.     TFB Committees all have lobbying agenda. Here is one of their 19 committee lobbying agenda. This is the Elder Law Section lobbying goals that receive funds and benefits from TFB

*LONG-TERM CARE & PUBLIC BENEFITS*
1. *Opposes legislation that would limit awards, attorney's fees and costs in liability actions brought against nursing homes or assisted living facilities.*
2. *Supports legislation that would increase staffing ratios, governmental oversight and Medicaid reimbursement rates to improve the general quality of care for residents in any long-term care facility, and opposes legislation that would decrease staffing ratios, governmental oversight and Medicaid reimbursement rates or otherwise decrease the general quality of care for residents in any long term care facility. (Revised January 30, 2009)*
3. *Opposes legislation that would eliminate or diminish the rights of residents of any long-term care facility.*
4. *Supports legislation to provide residents of assisted living facilities a process for administrative hearings and administrative review of discharge decisions.*
5. *Supports legislation that increases the personal needs allowance to qualified individuals residing in any long term care, health care and/ or residential facility.*
6. *Opposes legislation imposing filial responsibility for long term care of*
7. *Supports legislation recognizing the economic value of care provided to vulnerable adults by family members and friends.*

8. *Supports legislation that would increase and enhance the rights of residents of any long term care facility and which would restrict the use of over-burdensome and onerous provisions in admissions contracts used by long term care facilities.*
9. *Supports public access to long term care insurance at reasonable and affordable costs with adequate and reasonable benefits.*
10. *Supports adequate funding for programs that allow Florida's seniors to age in place and opposes reduction or elimination of funding for programs that allow Florida's seniors to age in place.*
11. *Supports legislation that aligns State Law with Veterans Administration Federal Law, with regard to the treatment of low income pension with Aid and Attendance and opposes legislation that impoverishes spouses of veterans living in the community.*

*AGE-RELATED CONCERNS*
1. *Opposes legislation that would restrict or revoke driving privileges based solely upon aging factors.*
2. *Supports the development and implementation of a public education program stressing the need for screenings for memory impairment and the importance of early diagnosis and treatment of Alzheimer's disease and related disorders; and supports the mandate that the Department of Elder Affairs conduct, or provide support for, a study on the benefits of memory screenings and the scientific evidence on the techniques for memory*

*JUDICIARY*
1. *Opposes any legislation that would allow the clerks of court in any and/or all circuits to assess and collect audit fees or other fees in guardianship or probate cases that would be a percentage of the total amount or value of the respective guardianship or probate*
2. *Opposes any legislation that would decrease current court authority and control over guardianship or probate matters while increasing, correspondingly or otherwise, the clerk of courts authority over these same matters.*
3. *Supports adequate funding of the state courts system, the Office of Public and Professional Guardians, state attorneys' offices, public defenders' offices, and court- appointed counsel.*

*GUARDIANSHIP & EXPLOITATION OF VULNERABLE ADULTS*
1. *Opposes the adoption of summary guardianship proceedings outside the protections of Chapter 744, Florida Statutes.*
2. *Supports legislation that enhances and increases the protection of vulnerable individuals wherever they reside, and opposes any legislation that erodes or decreases such*

3. *Supports adoption of a Uniform Adult Guardianship and Protective Proceedings Jurisdiction Act.*
4. *Supports legislation designed to discourage or prevent abuse, neglect or exploitation of individuals, and to aid in recovery of damages to abused, exploited or neglected individuals*
5. *Supports legislation providing for injunctions by family or household members for protection of adults from exploitation and providing for asset protection.*
6. *Opposes any legislation that would permit expanding the collection of data in guardianship cases without proper safeguards to ensure the data collected is narrowly tailored to meet the purpose and to ensure the protection of the data collected, and the identity of the vulnerable adult whose data is at issue.*
7. *Opposes any comprehensive rewrite of Florida's guardianship laws that does not include the substantial adoption of the Uniform Adult Guardianship Jurisdiction Act such that the state of Florida would not be considered an adoptee of the Adult Guardianship and Protective Proceedings Jurisdiction Act.*

## ESTATE PLANNING & ADVANCE CARE DIRECTIVES
1. *Supports legislation that protects an individual's rights relating to their health care decisions regardless of incapacity, and opposes any legislation that erodes such*
2. *Supports legislation which provides for expanded access to health insurance for all of Florida's citizens.*
3. *Supports physician orders for life-sustaining treatment legislation which has sufficient and comprehensive safeguards to protect the public.*

## PROBATE & TRUST ADMINISTRATION
1. *Opposes legislation that amends any statutes relating to the presumptively reasonable compensation for attorneys for personal representatives and trustees in the Florida Probate Code and the Florida Trust Code unless the proposed legislation preserves the standards currently reflected in each of those codes.*
2. *Opposes the expansion of creditors' rights beyond the current statutory and common law rights available to creditors under Florida law.*
3. *Supports legislation that protects, and opposes legislation that erodes, current statutory protections for all possible beneficiaries of estates and trusts for receiving annual, comprehensive, and understandable accountings and required notices by personal representatives and trustees.*

## C. INTERMEDIATE SANCTIONS - EXCESS BENEFIT TRANSACTIONS

15.     In addition, if a supporting organization makes a grant, loan, payment of compensation, or similar payment to a substantial contributor of the organization, the arrangement is an excess benefit transaction. The entire amount of the payment is taxable as an excess benefit.

## D. SECTION 501(C)(3) TAX-EXEMPT ORGANIZATIONS

16.     Under the Internal Revenue Code, all section 501(c)(3) organizations are absolutely prohibited from directly or indirectly participating in, or intervening in, any political campaign on behalf of (or in opposition to) any candidate for elective public office. Contributions to political campaign funds or public statements of position (verbal or written) made on behalf of the organization in favor of or in opposition to any candidate for public office clearly violate the prohibition against political campaign activity. Violating this prohibition may

result in denial or revocation of tax-exempt status and the imposition of certain excise taxes.

17.    Certain activities or expenditures may not be prohibited depending on the facts and circumstances. For example, certain voter education activities (including presenting public forums and publishing voter education guides) conducted in a non-partisan manner do not constitute prohibited political campaign activity. In addition, other activities intended to encourage people to participate in the electoral process, such as voter registration and get-out-the-vote drives, would not be prohibited political campaign activity if conducted in a non-partisan manner.

18.    On the other hand, voter education or registration activities with evidence of bias that (a) would favor one candidate over another; (b) oppose a candidate in some manner; or (c) have the effect of favoring a candidate or group of candidates, will constitute prohibited participation or intervention.

19.     To be tax-exempt under section 501(c)(3) of the Internal Revenue Code, an organization must be organized and operated exclusively for exempt purposes, which include charitable, religious, educational, scientific, literary, testing for public safety, fostering national or international amateur sports competition, and preventing cruelty to children or animals

20.     Many types of organizations, including 501(c)(3) nonprofits, are generally eligible to apply for funding opportunities on Grants.gov

21.     Grants to individuals for travel, study, or other similar purposes (including loans made for charitable purposes, and program-related investments) are taxable expenditures for private foundations Grants to organizations are also taxable expenditures unless expenditure responsibility is not required. Grants for non-permitted purposes are taxable expenditures, so private foundations may not make grants to organizations that are not tax-exempt under Section 501(c)(3)

22.     501(c)(3) organizations are only allowed to engage in activities that promote their tax exemption, such as applying for grants to operate their programs Once an organization has its

501(c)(3) status, it can apply for grants, conduct fundraising activities, obtain donations, and manage programs. Donated income and/or materials, which have value, must be used toward the programs, activities, or salaries. An organization is responsible for keeping track of this information as well as reporting it to the Internal Revenue Service (IRS) and the state where the organization is located

23.    As tax-exempt organizations, 501(c)(3) nonprofits must make their grant applications, reports, and other documents available for public inspection to maintain transparency and accountability.

## **FACTS GIVING RISE TO THIS QUI TAM**

24.    The RELATOR(S), were both members of TFB, who directly observed and were exploited by the actions giving rise to this Qui Tam False Claims Federal case and have been directly harmed by the acts alleged against the DEFENDANT(S) in this Qui Tam Complaint.

*IN 1930 WHEN MANDATORY MEMBERSHIP OF THE BAR WAS IN EFFECT, THE FLORIDA SUPREME COURT SPECIFICALLY REJECTED THE FLORIDA BAR'S PROPOSAL TO REGULATE LAWYER DISCIPLINE*

25.     When Florida Bar membership was mandated, self-regulation was intentionally denied by FSC as follows. In 1889, membership to TFB was voluntary. In the 1930s, TFB proposed mandatory membership to the FSC for the purpose of communication and discipline. However, the FSC <u>rejected this proposal when argued with the need to oversee discipline</u>.

26.     In 1947, TFB proposed mandatory membership for the 2nd time, this time for the purpose of Lawyers receiving uniform education on changes in the law and legal procedures. Based on these terms, the FSC granted mandatory membership.

27.     In 1955, TFB Board of Governors establishes "A Florida Bar Foundation" (, a 501(c)(3) non-profit. In 1976, it was determined that disciplinary authority was held by the FSC and only preliminary screening was delegated to TFB. *The Florida Bar v. McCain*, 330 So. 2d 712, 714 (Fla. 1976).

28.     In 1992, the American Bar Association, published their

McKay Report, recommendation that all States have a separate

disciplinary agency from their State Bars.

29.     In 2018, The McKay Report was again published by the

ABA. This report stated:

> "...warned of a scandalous situation in professional
> discipline and called for the immediate attention of the
> profession....they specifically warned against
> delegating professional discipline to a self-regulating
> profession..."

There were only 6 states who refused to take this

recommendation. Florida was one of these states. It was further

predicted that

> ".... if states did not follow this recommendation a
> monopoly of market competitors would be created
> harming the public and those professional who
> became targets.."

30.     From 1889 until present, TFB slowly has gained

exclusive control over the disciplinary process, with minimal

oversight by FSC.  The governing authority over attorney rules

of ethics have been written vague and ambiguously, while

inconsistently applied to Florida licensed attorneys.

31.     TFB has gained this control by piecemeal petitions to amend various rules without attention paid to the historical events taking place to determining mandatory bar membership in a self-regulated legal profession.

32.     In result of this exclusive control over who can and cannot practice, all those holding positions of judicial authority with FSC, have been placed in this position by those controlling TFB, which has now created a monopoly in the legal profession, making it impossible to find resolution for an attorney challenging this regulatory scheme.

33.     With the creation of the FFLA, non-profit, 501(c)(3), this allows donations and payments to be received by TFB through FFLA grants created by the donations of attorneys, judges, law firms, and committees. Essentially scrutinizing those within the legal profession, who do not contribute through donations to the FFLA.

34.     To ensure funding by solo, small and middle-sized firms, TFB, created the FLA non-profit, 501(c)(3), forcing those who TFB decided to pursue ethics complaints against to pay forced

fees for evaluations and treatments to maintain their license to practice law.

35.    Furthermore, many of large law firm donors are Probate and Trust Law Section of the Florida Bar, Gray Robinson, PA, and Holland & Knight, LLP, both large firms who handle a high amount of Guardianship Cases.

Example:

    A. In 2022, the following made gifts or pledges for over $10,000 to The Florida Bar Foundation, Probate and Trust Law Section of the Florida Bar, Gray Robinson, PA, and Holland & Knight, LLP, amongst others

36.    According to The Florida Bar Journal, Vol. 78, No. 10 November 2004, TFB has a legislative program, that gives maximum freedom to pursue separate lobbying agendas to members and sections of TFB. According to TFB annual budgets, which is public record, these sections receive funding & extensive benefits from TFB, who is funded by the mandatory membership fees from Bar Members and is given substantial grants from FFLA.

37.     TFB, responsible for creating both, FFLA and FLA 501c(3), who receives tax benefits under 501(c)(3). While giving grants to TFB, who is turn, provides funding & benefits to various Florida Bar Committees, who engage in lobbying.

38.     The Elder Law Committee of TFB, continues to extensively lobby for the furtherance of maintaining their ability under statute to be compensated attorney fees in guardianship cases.

39.     RELATOR FERDERIGOS was a young attorney with a student loan debt of over $150,000, who became recognized from her success restoring rights to wards held in guardianships. For every ward she restored rights to, the attorneys and business profiting from the guardianships lost money.

40.     RELATOR FERDERIGOS, was public about the issues she believed were contributing to guardian exploitation of a ward's estate by the members of TFB, being their ability to statutorily collect attorney fees from a ward's estate. She was also working with the Palm Beach Clerk of Court educating them in how to discover guardianship fraud by members of TFB.

41.     After successfully restoring rights to wards, and going
public about the need to change the statute to not allow
members of TFB to be able to collect attorney fees from a wards
estate,  RELATOR FERDERIGOS because a target for those
serving on the Elder Law Committee. They used the Florida
Disciplinary process to coerce RELATOR FERDERIGOS into
retirement. Furthermore, the past president of TFB, Dori-Foster
Morales, Esq., also served as director for the FFLA, who was
opposing counsel against RELATOR FERDERIGOS in a Miami-
Dade county case no. 2019DR009867 in 2021. After discovering
RELATOR FERDERIGOS, intentions to appeal a judgement that
could change the standard on attorney fees in miami-dade
county, she told her client, Patsy Alcantar, that her goal this
next year was to disbar RELATOR FERDERIGOS.

*TFB DISCIPLINARY PROCESS ALLOWS DISCRETION ON WHICH
ATTORNEY ETHIC COMPLAINTS TO PURSUE*

42.     Under Ch. 3 disciplinary proceedings, TFB, created a
division called Attorney Consumer Assistance Program (ACAP),
that is set up to prescreen all attorney ethics complaints. This

division has the discretion to drop an ethics complaint against
an attorney at intake.

43.     Shanell M. Schuyler, formerly of *Welch, Finkel &
*Schuyler*, is the director of the Attorney Consumer Assistance
Program (ACAP), who practiced in real estate, estate, and
probate law, serving on the Elder Law Committee in
furtherance of the lobbying efforts to keep attorney fees
against a ward's estate as part of the statute. She oversees
which ethics complaints should be pursued and which ones
should be dropped.

44.     ACAP, under the direction of Shanell M. Schuyler, holds
the power to determine which ethics complaints to refer to a
local committee within the county where the accused attorney
is registered.

45.     At this point an investigator is assigned to the case to
investigate. TFB, allows investigators who work for TFB, to
simultaneously own their own private investigation company
who service local investigation for local attorneys.

46.     Staff Investigator who was assigned to the RELATOR
FERDERIGOS cases at the local committee in Orange, County,

Florida was named David Pennell, worked for TFB for seven (7) years at the time he was investigating RELATOR FERDERIGOS ethics complaints. Additionally, he was operating his private local investigation company, "Scotland Yards Investigations" that has remained active on Sunbiz.org.

47.     RELATOR FERDERIGOS discovered this investigator made false reports against her that were never provided to her prior to being submitted to the grievance committee during his investigation. This resulted in TFB filing Formal Complaints filed against RELATOR FERDERIGOS.

48.     RELATOR FERDERIGOS, notifies TFB, to these false investigative reports. Coincidentally, three (3) days later, on 2-9-2023, the investigator retires from TFB, having worked for them for (7) years. None of the Florida Bar Board of Governors would communicate with RELATOR FEDERIGOS, regarding this issue and took measures to conceal this investigator's retirement.

49.     Additionally, TFB announces they appoint members of the public to serve on these local grievance committees. However, the mother of the executive director for TFB, Joshua

Doyle's mother served as a member of the public on the local grievance committee for Orange County, Florida.

50.     During this disciplinary process, the FSC, issues orders citing rule 3-7.6, prohibited accused Attorneys from seeking any remedies with FSC, while their cases are pending before the referee. Thus, accused Attorney have no place to seek a remedy for wrongful actions taking place during disciplinary proceeding nor will any Board of Governors communicate or address an issue an accused attorney brings forth. The FSC Orders filed in accused attorneys cases filed with the Florida Supreme Court states:

> Plaintiff is again advised that, pursuant to rule 3-7.6(h)(5)(B), Rules Regulating the Florida Bar, all pleadings, motions, notices, and orders filed after appointment of a referee must be filed with the referee, not with the Florida Supreme Court. While this case is pending before the referee, any future filings from Plaintiff that are not authorized for filing in this Court pursuant to the Rules Regulating the Florida Bar will not be docketed in this case.

51.     Magistrates serving in Federal District Courts in Florida, are required to maintain good standing with TFB and must seek recommendations by TFB, for appointment and re-appointment

after their term ends. This makes it impossible for any accused

attorney to seek oversight and resolve for wrongful actions of

TFB.

*ABA WARNED FLORIDA OF CREATING A LEGAL
MONOPOLY IF THE RECOMMENDATIONS OF THE MCKAY
REPORTS WAS NOT FOLLOWED*

52.     On 2018, the American Bar Association ABA, published

their McKay report recommend states to eliminate local

disciplinary enforcement as previously recommended in the

Clark Report of 1970. They explain that local components, such

as local bar investigative committees, foster cronyism as well as

prejudice against unpopular Plaintiffs. Local components result

in a lack of uniformity in procedures and in the application of

the rules of professional conduct. Local components promote

delay in the handling of disciplinary cases." The American Bar

Association has warned for decades that it should not be a local

bar investigative committee that will apply the rules of

professional conduct to decide whether an ethics inquiry

becomes a Bar Complaint.

*GOVERNMENT ACCOUNTABILITY OFFICE (GAO) HAS CONDUCTED
INVESTIGATIONS ON GUARDIANSHIP EXPLOITATION AND*

*REFERENCED THE DIFFICULTY IN KNOWING THE TRUE ISSUE BECAUSE STATES ARE NOT KEEPING FULL RECORDS*

53.     The Government Accountability Office (GAO) has conducted several investigations into guardianship exploitation and highlighted the challenges of understanding the full scope of the issue due to inadequate record-keeping by states.

54.     In a 2010 report, the GAO found cases of financial exploitation, neglect, and abuse of seniors by guardians. They tested state guardian certification by applying for certification in four states using fictitious identities, revealing weaknesses in the screening process. A 2017 report noted that the extent of elder abuse by guardians nationally is unknown due to limited data provided by the states.

55.     The GAO has emphasized the need for better data on guardianships. A lack of data on individuals under guardianship hinders research and reform efforts (<u>Justice in Aging</u>). A study examining annual guardianship reporting procedures in each state underscored the need for standardized and comprehensive reporting.

56.     These investigations and reports underscore the

importance of strengthening guardianship oversight,

improving certification standards, and enhancing data

collection to better protect vulnerable adults and seniors.


*RELATOR FERDERIGOS WAS RETALIATED AGAINST, EXPLOITED,*
*THREATENED AND COERCED TO RETIRE HER LICENSE AFTER*
*BECOMING A TARGET TO THE ELDER LAW ATTORNEYS WHEN SHE*
*RESTORED RIGHTS TO NINE (9) WARDS WRONGFULLY BEING*
*HELD UNDER GUARDIANSHIPS IN FLORIDA AND WENT PUBLIC*
*ABOUT THE ISSUES WITH THE GAURDIANSHIP STATUTE*

57.     RELATOR FERDERIGOS, was a young attorney, with a

large student loan debt of over $150,000 that needed to be paid

back to the Federal Government after attending law school, in

her thirties.

58.     In 2021, RELATOR FERDERIGOS, gained national

recognition, appearing on ABC and NBC news for her success

in restoring rights to wards in guardianships. In December

2021, ABC aired a segment featuring RELATOR FERDERIGOS,

the following day, an Elder Law Attorney who was a member of

TFB, filed a complaint against her. Then a few months later,

more members of TFB and Guardians filed complaints against

her. All the complaints were referred to the local grievance committee in Orange County, Florida.

59.     During this time, RELATOR FERDERIGOS, terminated the services of her paralegal. Following the paralegal's termination, she connected with one of the members of TFB who filed a bar complaint against RELATOR FERDERIGOS, when the paralegal took measures to hack into RELATOR FERDERIGOS, client database, which she provided to the Elder Law Attorney.

60.     Shortly after this, members of TFB, who served on the Elder Law Committee started to appear in RELATOR FERDERIGOS' cases. Together the members of TFB, with the assistance of the former paralegal began to distribute the paralegal's bar complaint, containing attorney-client privilege information across court in Florida and proceeded to file affidavits while requesting the Wards who RELATOR FERDERIGOS restored rights to, be placed back into guardianships.

61.     RELATOR FERDERIGOS, notified TFB, about what was taking place, however, no one would respond to investigate it further.

62.     During this time, RELATOR FERDERIGOS, received written death threats against her (3) young kids, connected with the members of TFB, who served on the Elder Law Committee had her phone hacked, hate sites published on social media. RELATOR FERDERIGOS, filed a police report and the State Attorney, who was also a member of TFB, that had originally planned to prosecute, declined to prosecute after discovering, this crime involved members of TFB.

63.     One month prior to the trial set against RELATOR FERDERIGOS, TFB's prosecutor and FLA, sent police to RELATOR FERDERIGOS, home in an attempt to Baker Act her. However, once police arrived, they learned this was not warranted to do so and left.

64.     TFB held these complaints open for over two (2) years, leading to the complete destruction of RELATOR FERDERIGOS, career and law firm. Ultimately, leading RELATOR FERDERIGOS, to retire her license.

65.     RELATOR FERDERIGOS, filed to Petition for Retirement stating she could no longer endorse the unethical actions she witnessed by TFB, and being she is required to be a member of

TFB to practice law in Florida, she could no longer hold her oath. However, TFB, told her she must take that language out, and once she did, they would approve her retirement.

66.     Members of TFB, who were involved in RELATOR FERDERIGOS', disciplinary proceeding, refused to place any incriminating evidence into the public records, nor publish her responses with FSC.

67.     When RELATOR FERDERIGOS, retired, she made a phone call to the Prosecutor from TFB, who apologized to RELATOR FERDERIGOS, stating "she was only doing what those higher up had told her to do". Shortly after, it was discovered, the Prosecutor no longer worked for TFB.

68.     RELATOR FERDERIGOS, has been left with Federal Student loan debt of over $150,000. Her reputation ruined and no career to afford her debt and bills with three (3) small children. Because TFB took measures to publish two formal complaints, never proven against her, that still remain across the internet, RELATOR FERDERIGOS, has been rejected by every job she submitted to be considered for.

*RELATOR GAFFNEY BECAME DISBARRED BY A SUMMARY JUDGMENT AFTER BECOMING A TARGET OF AN ELDER LAW ATTORNEY SEEKING TO COLLECT ATTORNEY FEES FROM A GUARDIANSHIP*

69.     On 6-3-2009, RELATOR GAFFNEY and her Father, now deceased, transferred the title of his homestead property to his daughter RELATOR GAFFNEY, located at 119 SOUTH CLARK AVE. TAMPA, FL 33609 as a quick claim deed.

70.     On 6-19-2009, a Petition was filed to place, RELATOR GAFFNEY'S father into a guardianship. However, at the time this petition for guardianship was filed, this homestead property was never listed as property sought to be protected under guardianship and remained the homestead property of RELATOR GAFFNEY.

71.     On 6-29-2009, RELATOR GAFFNEY'S father signed a will while his guardianship case was open, where he lists the homestead property as a life estate with a remainder interest to his daughter, RELATOR GAFFNEY. Within this will he states his expenses for care and well-being to be paid from proceeds, and balance given to DEFENDANT CHRIST THE KING, and his daughter, RELATOR GAFFNEY'S convenience.

72.     On 8-20-2009, a Order was entered determining the RELATOR GAFFNEY'S father was incapacitated, and he was placed into a plenary guardianship.

73.     On 12-26-2011, the Decedent died with a will.

74.     On 1-12-2012, RELATOR GAFFNEY, transferred her homestead property to a trust in her daughter's name on 6-3-2009. This was done before any issues were brough in probate against this property.

75.     Soon after, on 1-30-2012, a probate case no. 12-CP-000221 was opened on RELATOR GAFFNEY'S father Estate in Probate.

76.     On 2-12-2013, a member of the Florida bar, filed a Statement of Claim for $74,776.24, for attorney fees he was ordered while representing the RELATOR GAFFNEY'S sister in the guardianship case. However, when there were no funds left in the Probate Estate, he chose to go after RELATOR GAFFNEY, claiming her homestead was fraudulently obtained. Furthermore, her homestead property was never listed on the Petition for Guardianship as property to become part of the

guardianship estate because it was no longer owned by her father.

77.     On 4-10-2014, this member of the Florida Bar, filed a civil case no. 14-CA-003762, against RELATOR GAFFENY, alleging her homestead was obtained on fraud and that he should be able to collect his attorney fees from her homestead property.

78.     In addition to filing this civil suit against RELATOR GAFFENY, he filed a bar complaint against her. This Bar complaint was sent to the local committee, and without an evidentiary hearing, RELATOR GAFFENY, was disbarred after practicing with a clean record for 39 years on a summary judgement.

79.     Since then, RELATOR GAFFENY, has been endorsed by out-of-state Judges, who specialized in ethics, writing affidavits in her support. However, members of the Florida Bar, serving as judges in State Courts of Florida have continued to portray her in a negative light in court records, careful to write any orders to disclose facts that would warrant question.

80.    RELATOR FERDERIGOS, has been provided voluminous bar complaints made by members of the public in Florida, alleging serious crimes against their property perpetrated by members of the Florida Bar. However, all their complaints were dropped at intake and never pursued farther, despite having lawyer's write affidavits in support of the submitted ethics complaints.

81.    RELATOR FERDERIGOS, been privy to multiple attorneys during her time practicing law, who told her after complaints were made against them, that they were not worried because they knew someone at the bar who would ensure their complaint was dropped. Moreover, various members of the Florida bar, have voiced to RELATOR FERDERIGOS, their fear in questioning the Florida Bar because of possible retaliation.

82.    The U.S. has the largest number of guardianships in the World, 1.8M, and 80% over the age of 65 years old. The GAO has reported frustration with the state's record keeping of the real reflection of the true amount of U.S. citizens being held in guardianships.

## LEGAL CLAIMS FOR RELIEF

### <u>COUNT ONE</u>
**Violations of the Federal False Claims Act 31 U.S.C. §3729(a)(1)(A)**

1. This Count is brought by RELATORS/ PLAINTIFFS in the name of the United States under the *qui tam* provisions of 31 U.S.C. § 3730 for DEFENDANT(S) violation of 31 U.S.C. § 3729(a)(1)(A).

2. By virtue of the above-described acts, DEFENDANT(S) knowingly caused to be presented false or fraudulent claims when they abused the disciplinary process, falsified records, reports, made threats against the RELATOR(S).

3. PLAINTIFF UNITED STATES, unaware of the false or fraudulent nature of the claims caused to be made by DEFENDANT(S) and in reliance on the accuracy thereof, paid and continues to pay defendant(s) for claims that would otherwise not have been allowed.

4. By reason of DEFENDANT(S) wrongful conduct, the United States has suffered substantial losses in an amount to be proved at trial, and therefore is entitled to multiple damages under the False Claims Act, to be determined at trial, plus a

civil penalty of $5,500 to $11,000 for each such false claim

caused to be submitted by defendant(s)


## COUNT TWO
**Violations of the Federal False Claims Act 31 U.S.C. §3729(a)(1)(B)**


5. PLAINTIFFS restate and incorporate each and every

allegation above as if the same were fully set forth herein.

6. This Count is brought by Plaintiffs in the name of the United

States under the *qui tam* provisions of 31 U.S.C. § 3730 for

Defendant(s)'s violation of 31 U.S.C. § 3729(a)(1)(B).

7. By virtue of the above-described acts, Defendant(s) knowingly

caused and continues to cause to be made or used fraudulent

claims when they abused the disciplinary process, falsified

records, reports, made threats against the RELATOR(S) while

benefitting from tax exemptions and grants approved by the

United States.

8. Plaintiff United States, unaware of the false or fraudulent

nature of the records and/or statements, efforts to exploit

the RELATORS, who at the time were members of TFB,

caused to be made and used by Defendant(s), and in

reliance on the accuracy thereof, has paid and approved, and continue to pay and approve, claims for tax status to receive tax exemptions and grants that would not have been paid or approved if any part of the truth were known.

9. By reason of Defendant(s)'s wrongful conduct, the United States has suffered substantial losses in an amount to be proved at trial, and therefore is entitled to multiple damages under the False Claims Act, to be determined at trial, plus a civil penalty of $5,500 to $11,000 for each such false statement caused to be made or used by Defendant(s).

## COUNT THREE
## Violations of the Federal False Claims Act 31 U.S.C. §3729(a)(1)(C)

Plaintiffs restate and incorporate each and every allegation above as if the same were fully set forth herein.

10.     Defendant(s) entered conspiracies with all those who benefit from federal tax exemptions, grants, and tax status as a governmental entity to help other third parties for the purpose of defrauding the Plaintiff United States.

11.    By the foregoing acts and omissions, Defendant(s) took actions in furtherance of its conspiracies, and exploitation of members within TFB, including but not limited to securing either members who went against the DEFENDANT(S) political agenda would be forced to retire and be disbarred, DEFENDANT(S) benefit from payment of substantial sums of monies to its co-conspirators in exchange for casting favorable light upon defendant(s), concealing records, and for finding ways to fraud records to not be discovered what the true records were , thereby exponentially ensuring they could continue to receive attorney fees from wards estates in guardianships.

12.    By the foregoing acts and omissions, Defendant(s) entered into these unlawful conspiracies to defraud the United States by causing false and fraudulent claims to be paid and approved in violation of the False Claims Act, 31 U.S.C.§3729(a)(1)(C).

13.    At all times relevant to the complaint, Defendant(s) acted with the requisite knowledge.

14.      As a direct and proximate consequence of

Defendant(s)'s conspiratorial conduct, the United States has

suffered significant, material financial damages in an

amount to be proved at trial.

15.      Defendant(s) is liable for multiple damages under the

False Claims Act, to be determined at trial, plus a civil

penalty of $5,500 to $11,000 for each ineligible claim

submitted to the United States for payment.


**COUNT FOUR**
**VIOLATIONS OF THE FLORIDA FALSE CLAIMS ACT**
**Fla. Stat. Ann. §68.082(2)**

Plaintiffs restate and incorporate each and every allegation above

as if the same were fully set forth herein.

16.      This is a claim for treble damages and penalties under
the Florida False Claims Act.

17.      By virtue of the acts described above, Defendant(s)

knowingly presented, or caused to be presented, false or

fraudulent records, concealing of records, intentional refusal

to keep records on the true number of guardianships in

Florida, exploiting members of TFB who have advocated

against their politcal agenda to the Florida State Government

for payment or approval.

18.     Fla. Stat§ 68.082(2)(a)-(c) provide liability for any person who-

Knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval; ... is liable to the state for a civil penalty of not less than $5,500 and not more than $11,000 and for treble the amount of damages the agency sustains because of the act or omission of that person.

Knowingly makes, uses, or causes to be made or used, a false record or statement material to a fraudulent claim; ... is liable to the state for a civil penalty of not less than $5,500 and not more than $11,000 and for treble the amount of damages the agency sustains because of the act or omission of that person.

Conspires to commit a violation of [the Florida False Claims Act] ; ...is liable to the state for a civil penalty of not less than $5,500 and not more than $11,000 and for treble the amount of damages the agency sustains because of the act or omission of that person.

19.     By virtue of the acts described above, Defendant(s)

knowingly made, used, or caused to be made or used, false

records and statements, and omitted material facts, to induce

the government to approve and pay such false and fraudulent

claims.

Specifically, Defendant(s) has:

- caused voluminous claims to be presented to the State of Florida,

- knowingly made, used or caused to be made or used false records to get false claims paid,

- conspired to defraud the state by getting false and fraudulent claims allowed or paid; and,

- failed to disclose the existence of the false claims and statements it has caused to be presented.

20.    The defendant(s) manipulation of investigations, false

reports, omissions of material facts in judicial orders

represents a false or fraudulent record or statement. Each

claim for tax exemptions, status as a governmental entity,

grants received, mandatory membership to TFB represents a

false or fraudulent claim for payment.

21.     Plaintiffs cannot at this time identify all of the false

claims   for   payment   that   were   caused   by   Defendant(s)'s

conduct. The false claims against voluminous elderly victims of guardianships, members of TFB, who were targeted, cannot be specifically pled without detailed analysis of all those members records who were targeted, wards who have been exploited by members of TFB, financial accounting of all DEFENDANT(S).

22.     The Florida State Government, unaware of the falsity of the records, statements, and claims made, or caused to be made by Defendant(s), paid and continues to pay the claims that would not be paid but for Defendant(s)'s false and illegal practices and continue to allow exclusive control without Governmental oversight.

23.     By reason of Defendant(s)'s acts, the Florida State Government has been damaged, and continues to be damaged, in substantial amounts to be determined at trial.

24.     The State of Florida is entitled to the maximum penalty of $11,000.00 for each and every false or fraudulent claim, record, or statement made, used, presented, or caused to be made, used, or presented by Defendant(s).

25.     Plaintiffs believe and aver that they are "original

sources" of the specific facts they were privy to during

the course of their own case and information on which

this action is based.

26.     This Court is requested to accept supplemental

jurisdiction of this related state claim as it is predicated upon

the exact same facts as the federal claim, and merely asserts

separate damage to the State of Florida in the operation of its

funding to child welfare agencies.

## **<u>COUNT V</u>**
### *The Whistleblower Protection Act (WPA) (5 U.S.C. § 2302(b)(8))*

27.     This Count is brought by RELATORS/ PLAINTIFFS in the

name of the United States under the *qui tam* provisions of 31

U.S.C. § 3730 for DEFENDANT(S) violation of Whistleblower

Protection Act, 5 U.S.C. § 2302(b)(8)

28.     By virtue of the above-described acts, DEFENDANT(S)

knowingly retaliated and caused harm in result of RELATOR(S)

knowledge of what was taking place by DEFENDANT(S).

Furthermore,   caused to be presented false or fraudulent

claims when they abused the disciplinary process, falsified records, reports, made threats against the RELATOR(S).

29.     PLAINTIFF UNITED STATES, unaware of the false or fraudulent nature of the claims caused to be made by DEFENDANT(S) and in reliance on the accuracy thereof, paid and continues to pay defendant(s) for claims that would otherwise not have been allowed.

30.     By reason of DEFENDANT(S) wrongful conduct, the United States has suffered substantial losses in an amount to be proved at trial, and therefore is entitled to multiple damages under the Whistleblower Protection Act (WPA) of 1989, RELATOR'S reinstatement of license to practice law, loss of income, compensatory damages, and attorney fees

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court enter Judgment against the Defendant(s) as follows:

A. That the Defendant(s) be enjoined from violating the provisions of 31 U.S.C. § 3729 et seq. and the equivalent State law claims for relief;

B. That this Court enter Judgment against Defendant(s) in an amount equal to three times the amount of damages the United States has sustained as a result of Defendant(s)'s actions, plus a civil penalty of not less than $5,500.00 and not more than $11,000.00 for each violation of 31 U.S.C.§ 3729 et seq;

C. That this Court enter Judgment against Defendant(s) in an amount equal to three times the amount of damages the State of Florida has sustained as a result of Defendant(s)'s actions, plus a civil penalty of not less than $11,000.00 for each violation of Fl. Stat. Ann. § 68.082(2);

D. That the Plaintiffs be awarded the maximum amount allowable pursuant to 31

E. U.S.C. § 3730(d) of the False Claims Act and the equivalent

provisions of the State statutes set forth above; That the Plaintiffs

be awarded all costs of this action, including reasonable

attorneys' fees, costs, and expenses pursuant to 31 U.S.C. §

3730(d) and the equivalent State statutes set forth above; and

That the United States, the States, and the Plaintiffs be granted

such other and further relief as the Court deems just and proper.

F. Damages under the Whistleblower Protection Act (WPA) of 1989,

RELATOR'S reinstatement of license to practice law, loss of

income, compensatory damages, and attorney fees

**JURY DEMAND**

Pursuant to Rule 38 of the Federal Rules of Civil Procedure,

Plaintiffs hereby demands a jury trial.

## CERTIFICATE OF SERVICE

WE DO CERTIFY, that a copy of the foregoing has been furnished electronically with the Clerk of Courts by using the EPORTAL system, all parties of record.

9-20-2024                                              /s/ Michael Ferderigos
Dated                                                  Michael Ferderigos, Esq.
                                                              Bar No.: 604011
                                                       10454 Birch Tree Lane
                                                       Windermere, FL 34786
                                                       Telephone 407-592-0035
                                                       michael@civilestatelaw.com